STATE of Wisconsin, Plaintiff-Respondent,

v.

Lionel D. WALKER, Defendant-Appellant.

Supreme Court

*No. 88–2058–CR. Argued November 1, 1989.—Decided April 2, 1990.*

(Also reported in 453 N.W.2d 127.)

For the defendant-appellant there were briefs (in court of appeals) and oral argument by *Charles Bennett Vetzner,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the brief (in court of appeals) was *Donald J. Hanaway,* attorney general.

CALLOW, WILLIAM G., J. This case is before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61., Stats. The defendant-appellant Lionel D. Walker (Walker) appeals from a judgment of conviction and an order denying his motion for post-conviction relief of the circuit court for Kenosha county, Judge Jerold W. Breitenbach.

Walker, who is black, raises three issues on appeal. First, Walker contends that he was denied his federal and state constitutional right to effective assistance of counsel because his counsel did not object when the prosecutor used a peremptory challenge to exclude the only black person from the petit jury. Second, Walker claims he was denied his federal and state constitutional right to effective assistance of counsel when his counsel failed to move to suppress lineup and in-court identifications as the forbidden fruits of an allegedly unlawful arrest. Third, Walker argues that the circuit court erred in refusing to admit evidence concerning a crime that occurred when he was incarcerated and that he claims was similar to those for which he was on trial.

We first conclude that Walker has established, prima facie, that the prosecutor used a peremptory challenge in a racially discriminatory manner during the jury selection process at his trial, that the prosecutor's explanation for the challenge was not sufficient to rebut the prima facie case, and that, as a result, Walker's convic-

tion must be reversed and he is entitled to a new trial. We further conclude that Walker's arrest was unlawful and that, on remand, the circuit court must determine whether the lineup identification evidence must be suppressed as the fruit of the unlawful arrest. If the circuit court determines that the lineup evidence should be suppressed as the fruit of the unlawful arrest, then the court must determine whether any in-court identification must be suppressed. We finally conclude that the circuit court did not err in excluding evidence concerning a crime that occurred while Walker was incarcerated.

We begin by setting forth the facts relevant to the issues raised by Walker. Between August 27, 1986 and September 1, 1986, armed robberies, which were executed in similar fashion, occurred in four city of Kenosha taverns: Jesse's Bar, V.J.'s Lounge, Friar Pub Tavern, and the Kenosha Tap. In all four cases, a black man entered the tavern, ordered Old Style beer, and then, speaking quietly, told the bartender to give him the money from the cash register. In each case, the man held his right arm inside his outer garment to create the appearance that he had a gun and departed immediately after receiving the money. All four robberies occurred in either the late evening or early morning hours, prior to the tavern's closing.

On September 4, 1986, at approximately 9:15 p.m., Walker was arrested in the fenced-in backyard of his home.[1] The arrest was made without a warrant. The next morning Walker, who was a suspect in the four above-mentioned armed robberies, was placed in a lineup

_____

[1]The trial judge apparently found at the post-conviction hearing that the arrest was made on the basis of a statement made by Walker's nephew concerning Walker's possible involvement in the theft of a van, not on the basis of suspicion of armed robbery.

consisting of six black males.[2] The eyewitness to the robbery at Jesse's Bar positively identified Walker. The eyewitness to the robbery at V.J.'s Lounge made a tentative identification of Walker, as did the eyewitness to the Friar Pub Tavern robbery. Two eyewitnesses to the Kenosha Tap robbery viewed the lineup. One eyewitness was unable to identify anyone, while the other positively identified Walker.

On September 25, 1986, a criminal complaint was filed, charging Walker with four counts of armed robbery. Prior to trial, Walker's counsel filed two motions that are relevant to the arguments Walker raises on appeal. First, on September 30, 1986, Walker's counsel filed a motion to dismiss the action on the ground that the court lacked jurisdiction because Walker was brought before the court pursuant to an illegal arrest. The circuit court denied the motion to dismiss, citing *State v. Smith,* 131 Wis. 2d 220, 388 N.W.2d 601 (1986), in which this court held that an illegal arrest would no longer deprive the court of personal jurisdiction over the defendant. Second, on November 7, 1986, Walker's counsel filed a motion to suppress evidence with respect to lineup, photographic, and in-court identifications of Walker on the ground that any such identification would violate multiple federal and state constitutional rights. Walker's counsel orally withdrew this motion at a December 5, 1986 hearing, explaining, in part, as follows:

> I have realized that since I made the motion, that Mr. Walker was represented by an attorney from the Public Defender's Office . . . at the line-up, and . . . no objections as to police procedures . . . were made by her at that time . . . .. I don't . . . have any inde-

---

[2]Apparently, a parole hold was placed on Walker sometime the day of the lineup, September 5, 1986.

pendent evidence at this time to support my burden . . . [with respect to] that motion . . . .. If there would be any information between now and then gathered until the time of trial, I would renew it, but at this time I am not aware of any.

The jury was selected for Walker's trial on December 15, 1986. Of the twenty venirepersons, one was black. During the voir dire examination of potential jurors, the black venireperson did not answer in a way that would suggest a disqualifying attitude to any general questions directed at the pool of jurors by the judge or by the lawyers, nor did the court or counsel ask the black venireperson any specific questions. Because only twelve people ultimately would serve as jurors at Walker's trial, the prosecutor and defense counsel each were allowed to use peremptory challenges to eliminate four venirepersons from the pool of twenty. With the third of his four peremptory challenges, the prosecutor eliminated the black venireperson. Defense counsel did not object.

Walker's three-day jury trial on the four counts of armed robbery commenced on December 15, 1986. During its case-in-chief, the prosecution introduced lineup evidence from all five eyewitnesses, and each eyewitness made an in-court identification of Walker as the perpetrator of the crime that each had observed. In addition, evidence that two eyewitnesses had identified Walker at Walker's preliminary examination was also introduced by the prosecution.

The theory of defense was that the four armed robberies in question had been committed by someone else, Walker having been misidentified as the perpetrator. In an effort to prove that theory, Walker introduced evidence about two armed robberies that occurred while he was incarcerated pending his trial for the four armed robberies in question. These two armed robberies were

similar to the four for which Walker was standing trial. However, the circuit court prevented Walker from introducing evidence about an armed robbery that was also similar in some respects to the crimes for which Walker had been charged and that also occurred when Walker was incarcerated. According to Walker's offer of proof, which consisted of the police reports concerning that armed robbery, the perpetrator was a black male with light skin tone and liver spots on his face. The trial judge excluded evidence about this crime because no eyewitnesses to the crimes for which Walker had been charged had described the perpetrator as having light skin tone and liver spots.

At the conclusion of the trial, the jury found Walker guilty of all four counts of armed robbery in violation of sec. 943.32(1)(b)(2), Stats. On January 28, 1987, the circuit court sentenced Walker to ninety-nine years imprisonment, as a repeater.

On July 11, 1988, Walker filed a post-conviction motion, alleging that he was denied his state and federal constitutional right to effective assistance of counsel. Walker asserted that his trial counsel was ineffective in two respects. First, Walker claimed that trial counsel was ineffective because he failed to make a *Batson*[3] objection when the prosecutor used a peremptory challenge to remove the only black person from the venire. Second, Walker alleged trial counsel was ineffective because he did not attempt to suppress lineup and in-court identification evidence as the fruit of his allegedly unlawful arrest.

A hearing was held on the post-conviction motion on September 29, 1988, at which Walker's trial counsel testified. With respect to his failure to make a *Batson*

[3]*Batson v. Kentucky,* 476 U.S. 79 (1986).

objection, trial counsel testified that prior to trial Walker had expressed reservations about being tried by an all-white jury and that Walker wanted blacks on the jury. Trial counsel testified that he would not have used a peremptory challenge to strike the only black person from the venire. According to trial counsel, at the time of trial, he was unaware of the relatively recent *Batson* decision, which placed limitations on the prosecution's ability to eliminate venirepersons of defendant's race with peremptory challenges. Trial counsel stated that he should have known about the *Batson* decision. He would have made a proper objection when the prosecutor used a peremptory challenge to eliminate the only black venireperson, trial counsel testified, had he known about the *Batson* decision. Walker, himself, apparently had knowledge of the *Batson* decision. Trial counsel testified that Walker informed him that the prosecutor's use of a peremptory challenge to exclude from the petit jury the only black venireperson may have been unlawful in light of a newspaper article Walker had read about the *Batson* decision.

With respect to his failure to attempt to suppress the lineup and the in-court identification evidence, trial counsel testified that he knew at trial that Walker was arrested in the backyard of his home without a warrant. Trial counsel further testified that he knew that it was unlawful to make an arrest at a suspect's home without a warrant, but that he never thought to challenge the identifications as the fruit of an unlawful arrest. Trial counsel made it clear that he would have preferred to have the identification evidence excluded.

The prosecutor also appeared at this hearing. With respect to the *Batson* issue, the prosecutor stated that he had no memory of any venireperson being black and that, in any event, he had no discriminatory intent. The

prosecutor asserted that a review of his notes from the jury selection process showed a possible explanation for his use of a peremptory challenge on the sole black venireperson: he simply had no information about him. With respect to the failure of Walker's trial counsel to attempt to suppress the identifications of Walker by the witnesses, the prosecutor asserted that trial counsel made a strategic decision not to pursue such a motion and that therefore it was unnecessary to consider the validity of Walker's arrest.

The circuit court denied Walker's motion for post-conviction relief in its Decision and Order filed on October 14, 1988. In the Decision and Order, the circuit court first addressed Walker's claim that he was denied his constitutional right to effective assistance of counsel because trial counsel failed to make a *Batson* objection during the jury selection process. The circuit court found that, although trial counsel erred in not lodging a *Batson* objection, the error did not constitute deficient performance. The circuit court also found that, had the *Batson* objection been made, the objection would not have succeeded because there was no evidence that purposeful discrimination tainted the jury selection process. According to the circuit court, Walker had failed to make out a prima facie case of purposeful discrimination. The circuit court noted that the prosecutor was unable to remember that one of the venirepersons was black. The circuit court ruled that the fact that Walker was tried by an all-white jury did not deprive him of a fair trial and that the result of the trial is reliable.

The circuit court then turned to a discussion of whether Walker was denied his right to effective assistance of counsel because trial counsel failed to attempt to suppress the lineup and in-court identifications as the fruits of an unlawful arrest. The circuit court ruled that

Walker was not denied his right to effective assistance of counsel in this regard. The circuit court found that trial counsel made a strategic decision not to move to suppress the lineup identifications, noting that trial counsel skillfully attempted to impeach the trial testimony of those witnesses who made less than positive identifications at the lineup. Moreover, the circuit court ruled that a motion to suppress the identifications would not have succeeded because the warrantless arrest was not unlawful. In concluding that the arrest was lawful, the circuit court reasoned as follows:

> The defendant was arrested in yard [sic] outside of his home that was in plain view of police officers as they arrived. The "plain view" exception to the warrant requirement justified his seizure. The officers arriving at the home went there with extremely strong probable cause to believe that the defendant committed a felony; the defendant was in plain view; the discovery was inadvertent for these purposes, in that they had no way of knowing that he was going to be outside the home when they arrived; and if the defendant would not have come out of the house voluntarily, they could have surrounded the home and obtained a search or arrest warrant since they would have had probable cause for both. The court relies upon the cases of *Conrad v. State,* 63 Wis. 2d 616 (1974) and *Bies v. State,* 76 Wis. 2d 457 (1977).

This case is presently before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats., and this court decided to consider all three issues raised on appeal.

## I.

Walker's first contention is that he was denied his state and federal constitutional right to effective assis-

tance of counsel when the prosecutor used a peremptory challenge to exclude the only black venireperson from the petit jury without a *Batson* objection by his trial counsel.

In the alternative to the ineffective assistance of counsel claim, Walker, relying upon this court's decision in *State v. Cleveland,* 118 Wis. 2d 615, 348 N.W.2d 512 (1984), urges this court to address the validity of the prosecutor's peremptory challenge as though Walker's trial counsel had made the proper objection during the jury selection process. In *Cleveland,* it was argued by the State that the defendant had waived his right to present his fourth amendment claim by failing to bring the proper pretrial motion and by failing to make the proper objection at trial. The defendant, on the other hand, claimed that he was denied his constitutional right to effective assistance of counsel since his trial counsel's failure to bring the proper pretrial motion and to object at trial was due to trial counsel's inadequate knowledge of the relevant law. This court noted that, "[a]lthough objections which have been waived are not reviewable as a matter of right, this court may consider such objections if it chooses." *Id.* at 632. This court chose to address the fourth amendment claim on the merits even though trial counsel failed to preserve the claim. Because the defendant's claim was resolved in this fashion, this court did not reach the question of ineffective counsel. *Id.* at 632–33.

In this case, it is undisputed that Walker's trial counsel was not aware of the Supreme Court's landmark decision in *Batson.* It is also undisputed that at some point in the proceedings Walker told trial counsel that he thought that the prosecutor's peremptory challenge on the black venireperson was illegal based on a newspaper article he had read about the *Batson* decision, yet

counsel did not object. In its decision and order regarding Walker's post-conviction motion the circuit court found that Walker's trial counsel committed error by failing to bring to the court's attention Walker's concern over the striking of the black venireperson. Given these circumstances, we have decided, at our discretion, to undertake an analysis of Walker's *Batson* claim pursuant to *Cleveland* and therefore analyze the claim as though a timely objection had been made. Because we treat the *Batson* claim under the *Cleveland* approach, we do not reach the question of ineffective assistance of counsel.

Walker argues that he was denied his constitutional right to equal protection of law[4] when the prosecutor used a peremptory challenge to exclude the only black venireperson from the petit jury, relying on the decision of the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79 (1986). Our analysis of Walker's claim thus begins with the *Batson* decision, itself.

In *Batson,* the defendant, a black man, was charged with second-degree burglary and receipt of stolen goods. During the jury selection process at the defendant's trial, the prosecutor used peremptory challenges to exclude from the petit jury the only four black persons on the venire, leaving an all-white jury. In the United States Supreme Court, the defendant argued that the prosecutor's removal of every potential black juror violated his rights under the sixth and fourteenth amendments to a jury drawn from a cross section of the community and to an impartial jury. The Court decided that proper resolution of the defendant's challenge depended upon equal protection principles, as was argued by the state of Kentucky; therefore, the Court did not address the defen-

---

[4]The Fourteenth Amendment to the United States Constitution provides, in part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

dant's sixth amendment argument. *Batson,* 476 U.S. at 82-83 & n.1.

The Court initially noted that in *Swain v. Alabama,* 380 U.S. 202 (1965), it recognized that the Equal Protection Clause is violated when the state intentionally excludes blacks from the petit jury on the basis of race. *Batson,* 476 U.S. at 84. The Court then noted that racial discrimination in the jury selection process harms three distinct groups. First, defendants are harmed when racial discrimination infects the jury selection process. Second, the rights of the excluded jurors are violated when they are denied the opportunity to serve as jurors on account of race. *Id.* at 86-87. Third, society is harmed by discriminatory jury selection procedures because such discriminatory procedures undermine public confidence in the fairness of our system of justice. *Id.* at 87.

Under *Swain,* in order for a black defendant to make out a prima facie showing that the state had used peremptory challenges in contravention of equal protection principles, the defendant was required to show that a prosecutor used such challenges in a racially discriminatory manner "in case after case . . . with the result that no Negroes ever serve on petit juries." *Swain,* 380 U.S. at 223. Thus, black defendants could not rely solely upon the facts of their particular cases alone to make out a prima facie showing that prosecutors had used peremptory challenges in violation of the Equal Protection Clause.

The Court in *Batson* noted that the *Swain* evidentiary burden for making out a prima facie case had "placed on defendants a crippling burden of proof, [in effect immunizing] prosecutors' peremptory challenges . . . from constitutional scrutiny." *Batson,* 476 U.S. at 91-92. The Court rejected the *Swain* evidentiary burden for making out a prima facie equal protection violation,

finding it inconsistent with the body of equal protection case law that had developed since the *Swain* decision. *Id.* at 93. The Court held that the equal protection cases decided since *Swain* provided support for the proposition that a defendant could establish a prima facie showing that the prosecutor had used peremptory challenges in a purposefully discriminatory manner by relying solely upon the facts of his or her case. *Id.* at 96.

After rejecting this portion of the *Swain* decision, the Court set forth what is required of a defendant in order to establish a prima facie case of purposeful discrimination with respect to the prosecutor's use of peremptory challenges:

> [T]he defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Id.* (quoting *Avery v. Georgia,* 345 U.S. 559, 562 (1953)) (citations omitted). With respect to the third element of the prima facie case, the Court provided two examples of "relevant circumstances" a trial court should consider. First, the Court noted that a "pattern" of strikes against venirepersons of the same race as the defendant might

172

raise an inference of discrimination.[5] Second, the Court stated that the prosecutor's questions and statements during voir dire might support an inference of discriminatory intent. *Id.* at 97.

The Court did not further elaborate upon what it meant by "all relevant circumstances." *Id.* at 96-97. However, other courts have considered the relevant circumstances trial judges should consider in assessing whether the defendant has established a prima facie case, finding the following factors significant:[6] whether the prosecution has eliminated all members of the defen-

---

[5]In this case, the State, seizing upon the use of the "pattern" language by the Court in *Batson,* infers that a court is prevented from finding purposeful discrimination when a prosecutor peremptorily challenges only one black venireperson in a case where the defendant is black. We do not believe that the Court in *Batson* intended such a rule, for, as another court has noted, "the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." *United States v. David,* 803 F.2d 1567, 1571 (11th Cir. 1986). A hard and. fast rule that no prima facie case could be established when a prosecutor uses peremptory challenges to strike only one or two black venirepersons would be highly inappropriate in Wisconsin where many jurisdictions have a low black population: "Black defendants would more often than not be forced to forfeit their rights under *Batson* merely because of the statistical likelihood that their jury venires will be overwhelmingly non-black." *United States v. Clemons,* 843 F.2d 741, 748 n. 6 (3d Cir.), *cert. denied,* 109 S. Ct. 97 (1988). In fact, in *Clemons,* the court noted that it is easier for a black defendant to establish a prima facie case when one or two blacks are excluded from the petit jury by the prosecutor's peremptory challenges in a jurisdiction with a low black population. *Id.* at 748.

[6]We consider these factors to be illustrative, not exhaustive.

173

dant's race from the panel of prospective jurors;[7] whether the race of the defendant or his or her witnesses is different than the race of the victim or the state's witnesses;[8] whether the excluded jurors sharing the defendant's race responded to any questions of the judge or the lawyers in a manner that made them suitable candidates for exclusion by the prosecutor;[9] how many

[7]Some courts have created a bright-line rule that when a prosecutor uses peremptory challenges to exclude all members of defendant's race from the petit jury, a prima facie case is automatically established, even if only one peremptory strike is needed to exclude all members of defendant's race. *See, e.g., Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988); *Pearson v. State,* 514 So. 2d 374 (Fla. Dist. Ct. App. 1987); *United States v. Chalan,* 812 F.2d 1302 (10th Cir. 1987), *cert. denied,* 109 S. Ct. 534 (1988). We decline to adopt this bright-line rule, especially in light of the fact that in *Batson,* the Court did not adopt such a rule, even though all four black members of the panel of prospective jurors were eliminated by the prosecutor's peremptory challenges. Rather, the fact that all members of the defendant's race have been eliminated by the prosecutor's peremptory challenges, even if that means striking only one person, is merely a factor the trial judge should consider in deciding whether the defendant has established a prima facie case. *Clemons,* 843 F.2d at 748; Serr and Maney, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance,* 79 J. Crim. L. & Criminology 1, 30 (1988) (hereinafter "Serr and Maney"). We agree with the conclusion of the Third Circuit Court of Appeals in *Clemons* that, "[a]lthough it may be easier to establish a prima facie case when all blacks are excluded from a jury, . . . we cannot say the conclusion is automatic. *Clemons,* 843 F.2d at 748.

[8]*See, e.g., Stanley,* 542 A.2d at 1278; *Clemons,* 843 F.2d at 748; *Gamble v. State,* 257 Ga. 325, 357 S.E.2d 792, 795 (1987); *State v. Robbins,* 319 N.C. 465, 356 S.E.2d 279, 295, *cert. denied,* 484 U.S. 918 (1987).

[9]*See, e.g., Stanley,* 542 A.2d at 1278; *People v. Scott,* 70 N.Y.2d 420, 516 N.E.2d 1208, 1211 (1987).

venirepersons share defendant's race; and the nature of the crime.[10]

According to *Batson,* if the trial judge finds that the defendant has established a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson,* 476 U.S. at 97. Although the Court recognized that this explanation "requirement imposes a limitation in some cases on the full peremptory character of the historic challenge," the Court emphasized "that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* The prima facie case is not rebutted, the Court noted, when the prosecutor states that venirepersons were challenged on the ground that they would favor the defendant because they were of the same race as the defendant. *Id.*

The Court in *Batson* also stated that the prosecutor's explanation must be clear and reasonably specific. *Id.* at 98 n.20. This requirement that the explanation be clear and reasonably specific is not satisfied by the prosecutor's mere denial of intent to discriminate or the prosecutor's mere affirmance of a good faith intent. *Id.* at 98. *See also Chalan,* 812 F.2d at 1314 (Concluding that the following explanation did not satisfy the "clear and reasonably specific" requirement: "based upon his background and other things in his questionnaire, I just elected to strike him.").

In addition to being neutral and clear and reasonably specific, the explanation must be "related to the particular case to be tried." *Batson,* 476 U.S. at 98. The New Jersey Supreme Court determined that the prosecutor's explanation was unrelated to the case to be tried in *State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150 (1986),

---

[10]*See, e.g., Clemons,* 843 F.2d at 748.

where the issue was whether a prosecutor's use of peremptory challenges violated the New Jersey Constitution. The court concluded that one of the prosecutor's explanations for striking blacks—that he wanted jurors of "high intellectual achievement"—was unrelated to the case to be tried because the case involved only the simple issue of whether the defendant could be identified as the perpetrator. *Id.* at 1168.

Once the defendant has established a prima facie case and the prosecutor has come forward with an explanation that is neutral, clear and reasonably specific, and related to the case to be tried,[11] the trial court must determine whether the defendant has established purposeful discrimination. *Batson,* 476 U.S. at 98. The defendant has the ultimate burden of persuasion with respect to the issue of purposeful discrimination. *Id.* at 94 n.18.[12]

---

[11]Of course, the defendant may show that the prosecutor's explanation for the peremptory challenge is in fact pretext for racial discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973).

[12]Upon a timely objection, if the defendant establishes a *Batson* violation, the proper remedy is either "to discharge the venire and select a new jury from a panel not previously associated with the case, or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." *Batson,* 476 U.S. at 99–100 n.24 (citations omitted). One factor the trial court should consider in selecting the appropriate remedy is whether the challenged juror is aware of the fact that he or she was challenged by the prosecutor. If the challenged juror is aware of the fact that he or she was challenged by the prosecutor, then that juror should not be reinstated because there is a substantial likelihood that he or she will have developed a bias against the prosecutor. Serr and Maney at 61 n.322.

We now apply these principles to the circuit court's decision in the case at hand. The circuit court concluded that Walker had failed to establish a prima facie case. In reaching this conclusion, the circuit court found the following factors significant: no pattern of strikes against potential jurors of Walker's race had been shown because the prosecutor challenged only one such juror; the prosecutor was not known by the trial judge for customarily eliminating blacks from the jury panel with peremptory challenges; and the prosecutor's questions during voir dire did not support an inference of discriminatory purpose.

We conclude that the circuit court erred in determining that Walker failed to establish a prima facie case.[13] Our review of the record shows that Walker is black, that only one of the venirepersons at Walker's trial was black, that the prosecutor used a peremptory challenge to exclude this sole black venireperson from the petit jury, and that Walker's counsel would not have used a peremptory challenge to strike this venireperson. The circuit court noted that blacks account for less than three percent of the population of Kenosha county and that the prosecutor in this case is not known for customarily striking blacks from the venire. The record also shows that this black venireperson did not answer in a way that would suggest a disqualifying attitude to any general questions directed at the pool of jurors by the

[13]In this case, we need not decide whether the circuit court's finding that Walker failed to put forth facts raising an inference of discrimination is a finding subject to a de novo or a clearly erroneous standard of review. *Compare Gay v. Waiters' and Dairy Lunchmen's Union,* 694 F.2d 531 (9th Cir. 1982), *with* Serr and Maney, at 38–39. Even under that standard of review according the greatest deference to the circuit court, we conclude that it was error to find that no prima facie case had been established.

177

judge or by the lawyers, nor did the court or counsel ask the black venireperson any specific questions. The record further indicates that every prosecution witness was white while all alibi witnesses for the defense were black. Finally, the prosecutor admitted that he struck the black venireperson because he knew nothing about him. These facts raise an inference of purposeful discrimination.

Because we conclude that Walker has made a prima facie showing of purposeful discrimination, the burden shifts to the prosecution to explain its actions. In its decision regarding Walker's post-conviction motion, the circuit court did not mention the prosecutor's explanations, apparently because the circuit court found that Walker failed to make out a prima facie case. Our review of the record shows that the prosecutor provided two explanations for using a peremptory challenge to strike the sole black venireperson. First, the prosecutor denied that he had a discriminatory motive. The Court in *Batson* declared that the mere denial of discriminatory intent is not sufficient to rebut an inference of purposeful discrimination. *Batson,* 476 U.S. at 98. Second, the prosecutor explained that, going into the jury selection process for Walker's trial, he only had information about jurors with juror numbers between 841 and 906. The black venireperson had a juror number of 944. The prosecutor thus stated that he struck the black venireperson because he had no information about him. This explanation is unacceptable because it is not "clear and reasonably specific." Moreover, this explanation appears to be pretextual. Of the prosecutor's four peremptory challenges, only one other was used to strike a potential juror with a juror number greater than 906, and seven potential jurors with numbers higher than 906 ultimately served on the jury.

We conclude that the circumstances surrounding the jury selection process at Walker's trial support an inference of purposeful discrimination and that the prosecutor did not adequately explain the racial exclusion. Because the record in this case shows an unrebutted prima facie case of purposeful discrimination, Walker's conviction must be reversed. *Batson, Id.* at 100.

## II.

Walker's second contention is that he was denied his constitutional right to effective assistance of counsel because his trial counsel failed to move to suppress both lineup and in-court identifications of Walker as the fruit of an unlawful arrest. Because we have already decided that Walker is entitled to a new trial, it is unnecessary to determine whether Walker's trial counsel was ineffective for failing to make such a motion. Rather, we need to decide only whether Walker's arrest was unlawful, and, if so, whether the identification evidence is the fruit of the unlawful arrest.

The first question we address is whether Walker's arrest was unlawful. The only significant references in the record to Walker's arrest are found in the transcript of the hearing held on Walker's motion for post-conviction relief. At this hearing, Walker provided the following testimony on direct examination regarding the circumstances surrounding his arrest:

Q. Mr. Walker, do you recall when you were originally arrested in this case?

A. Yes, I do.

Q. When was that?

A. It was September 4, 1986.

Q. Do you recall where you were at the time of the arrest?

A. I was at my home, my backyard.

Q. Is there a fence around your backyard?

A. Yes, there is.

Q. I'm sorry. Did you say what time it was that you were arrested?

A. It was approximately 9:15. Between 9:15, I think—between 9:00 and 9:30 in the p.m.

Q. p.m.

A. p.m., exactly.

Q. Did any of the arresting officers ever show you a warrant?

A. No.

On cross-examination, Walker further testified about his arrest as follows:

Q. Mr. Walker, relative to your arrest for a moment, you were told the reasons why you were arrested, weren't you?

A. No, I was not. ·

Q. You were just taken into custody—

A. Yes.

Q. —by the police on September 4th?

A. On September 4th, right.

Q. Do you remember what time on September 4th?

A. Approximately 9:00, 9:30 p.m.

Q. p.m. or a.m.?

A. p.m.

Q. So it was dark out?

A. Yes, it was.

Q. You recall what you were doing in the backyard?

A. I was bedding my dog down.

Q. Okay. You were not in the house itself?

A. No, I wasn't.

Q. Okay. You were arrested by police officers in uniform?

A. I was arrested by plainclothed detectives and police officers in uniform.

. . . .

Q. You were never told of any reasons why you were arrested then?

[DEFENSE COUNSEL]: Objection, asked and answered.

THE COURT: It has been . . .. My question, sir, is how did they get there. Did they come through an alley or around the side of the house? How'd they get there.

THE WITNESS: They came from—They came in through up in the driveway into the backyard into the house. There were police at the door, the front door of the house, from what I understand, and there were police on the side of the house pointing at the window. Obviously, they thought I was in the house.

THE COURT: I see.

THE WITNESS: And I was in the backyard on the side of the garage with my dog, bedding my dog down for the evening. I had been jogging and I just came back from jogging. I bedded my dog down, when I heard—I heard a noise and I turned and the police—plainclothed detective was standing there,

and he said, "Don't move, brother, or I'll blow your head off." That's when I was arrested.

THE COURT: And you were still in the backyard?

THE WITNESS: I was in the backyard.

THE COURT: Where did the officer come from?

THE WITNESS: From the driveway.

THE COURT: I see. All right.

The District Attorney offered no evidence at this hearing concerning Walker's arrest. The record thus shows that, at the time of Walker's warrantless nighttime arrest, Walker was in the fenced-in backyard of his home.

In deciding whether Walker's arrest was lawful, we begin by examining the nature of the protection that the fourth amendment provides to the home and the land next to the home.[14] In *Payton v. New York,* 445 U.S. 573 (1980), the United States Supreme Court held that the fourth amendment, made applicable to the states by the fourteenth amendment, prohibits police from making a warrantless and nonconsensual entry into a felony suspect's home to arrest the suspect, absent probable cause and exigent circumstances. The Court has also determined that the fourth amendment protections that attach to the home likewise attach to the curtilage, which is defined generally as "the land immediately surrounding and associated with the home." *Oliver v. United States,* 466 U.S. 170, 180 (1984). In *Oliver,* the Court reasoned that the curtilage receives the fourth amendment protections that attach to the home because,

---

[14]The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, homes, papers, and effects" to be free from unreasonable searches and seizures.

"[a]t common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Id.* (quoting *Boyd v. United States,* 116 U.S. 616, 630 (1886)).

Read together, *Payton* and *Oliver* require that police obtain a warrant before entering either the home or its curtilage to make an arrest absent probable cause and exigent circumstances. Under *Payton* and *Oliver,* therefore, absent probable cause and exigent circumstances, Walker's warrantless arrest, although not occurring in his home, was unlawful if his fenced-in backyard falls within the curtilage of his home.

In *Oliver,* the Court stated that the reach of a home's curtilage was in general determined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver,* 466 U.S. at 180.[15] The Court explicitly stated the factors relevant to defining the extent of a particular home's curtilage in *United States v. Dunn,* 480 U.S. 294, 301 (1987):

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of uses to which the area is put, and the steps taken by the

---

[15]That the Court in *Oliver* treated the home and the curtilage the same for fourth amendment purposes is entirely consistent with the Court's landmark decision in *Katz v. United States,* 389 U.S. 347 (1967). Under *Katz,* in order for an area to receive fourth amendment protection, a person must have a "reasonable expectation of privacy [in that area]." *Id.* at 360 (Harlan, J., concurring). The above-quoted passage from *Oliver* shows that the curtilage is such an area that a person reasonably may expect will remain private.

resident to protect the area from observation by people passing by.

According to the Court in *Dunn,* these factors help focus the inquiry on the proper question; namely, "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of fourth amendment protection." *Id.* Applying these factors to the case at hand, it is obvious that Walker's fenced-in backyard falls within the curtilage of his home.

Because Walker was arrested within the curtilage of his home without a warrant, his arrest was unlawful in the absence of probable cause and exigent circumstances. Assuming that probable cause to arrest existed, the prosecutor did not, at the post-conviction motion hearing, offer proof with respect to exigent circumstances, although the prosecutor was given the opportunity to do so. The prosecutor had the burden of proof to show exigent circumstances. *See, e.g., Welsh v. Wisconsin,* 466 U.S. 740, 749–50 (1984).[16]

---

[16]Walker's arrest is not valid under *United States v. Santana,* 427 U.S. 38 (1976), as argued by the State. In *Santana,* the officers first attempted to arrest Santana after they found her standing on the threshold of her house. As she was standing on the threshold, Santana spotted the officers coming for her and took refuge inside her house, where the arrest was made. The threshold of one's house is a place; although on private property, that is used by various members of the public and is visible to any person that passes by the house. A fenced-in backyard, on the other hand, is not an area accessible to the public, and one is normally not visible to those passing by the front of the house. *See State v. Parker,* 399 So. 2d 24, 28 (Fla. Dist. Ct. App. 1981) (enclosed backyard is zone of privacy for fourth amendment purposes, and the backyard is more private than the front yard

Since we have concluded that Walker's arrest was unlawful, we must now determine whether the lineup and the in-court identifications of Walker by the witnesses are the forbidden fruit of the unlawful arrest. *Wong Sun v. United States,* 371 U.S. 471 (1963); *United States v. Crews,* 445 U.S. 463 (1980). There is language in our prior opinions stating that a lineup identification may not be suppressed on the ground that it is the fruit of an illegal arrest. *See, e.g., Schaffer v. State,* 75 Wis. 2d 673, 679–80, 250 N.W.2d 326 (1977) (quoting *State v. Brown,* 50 Wis. 2d 565, 570, 185 N.W.2d 323 (1971)). In a more recent case, *State v. Cheers,* 102 Wis. 2d 367, 306 N.W.2d 676 (1981), this court was confronted with the issue of whether out-of-court and in-court identifications had to be suppressed as the fruit of an allegedly unlawful arrest. In *Cheers,* this court found the arrest to be lawful and therefore was not required to reach the issue of suppression of the identification evidence. How-

---

because the backyard cannot be seen by those passing by the front of the house). The hot pursuit doctrine justified the in-home arrest in *Santana.*

Moreover, the circuit court erred in determining that Walker's arrest was justified under the plain view exception to the warrant requirement. Assuming that the plain view exception applies to the seizure of persons, it is clear that the "plain view *alone* is never enough to justify [a fourth amendment seizure] . . .." *Coolidge v. New Hampshire,* 403 U.S. 443, 468 (1971) (emphasis in original). That plain view alone can never justify a warrantless seizure, the Court in *Coolidge* went on to state, "is simply a corollary of the familiar principle . . . that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' " *Id.* Even if Walker became visible to police as they attempted to surround his house, no circumstances have been shown that justify his seizure as he occupied a protected area.

ever, in the case at hand, we are required to reach the issue of whether the identification evidence should be suppressed because we have found that the arrest was unlawful. In light of *Crews* and *Wong Sun,* we overrule *Brown* and *Schaffer* insofar as they hold that lineup identification evidence may not be suppressed as the fruit of an unlawful arrest.

The primary question in cases such as this one where it is claimed that evidence is the forbidden fruit of an unlawful government act was stated by the Court in *Wong Sun:*

> the . . . apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun,* 371 U.S. at 488 (quoting Maguire, *Evidence of Guilt,* 221 (1959)). The State has the burden to prove that the identification evidence in question is admissible once the defendant has established the "primary illegality." *See Brown v. Illinois,* 422 U.S. 590, 604 (1975).

We turn first to the question of whether the lineup identification evidence is the fruit of the unlawful arrest. The lineup, itself, was held on September 5, 1986, at 9:30 a.m., approximately twelve hours after Walker's arrest. Five eyewitnesses to the armed robberies, all of whom testified at Walker's trial, viewed the lineup. In determining whether lineup identification evidence from these witnesses should have been admitted at trial, we agree with the suggestion of one commentator that the analysis is the same as the analysis undertaken by the United States Supreme Court in *Brown,* where the ques-

tion was whether a confession was the fruit of an unlawful arrest. 4 LaFave, *Search and Seizure,* sec. 11.4(g), at 433 (hereinafter "LaFave"). In *Brown,* the Court identified three factors relevant to such inquiries:

> the temporal proximity of the arrest and the [lineup], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct . . ..

*Brown,* 422 U.S. at 603–04 (citations omitted).

The first *Brown* factor—the temporal proximity of the arrest and the lineup—is significant only in the sense that it may reveal the purpose of the arrest (factor three). 4 LaFave, sec. 11.4(g) at 434–35. The second factor is the presence or absence of intervening circumstances. Bringing the defendant before a committing magistrate to advise the defendant of his or her rights and to set bail has been deemed a sufficient intervening circumstance to cleanse the lineup of any taint stemming from an unlawful arrest. *Johnson v. Louisiana,* 406 U.S. 356, 365 (1972).[17] With respect to the third factor, the fact that the arrest was not flagrant and was not for the purpose of putting the defendant before a lineup is not enough alone to validate the lineup. Rather, the absence of this factor merely means that less is required in terms of intervening circumstances. 4 LaFave, sec. 11.4(g), at 434, 435.

Because the record in this case does not permit us to apply these factors to the case at hand, this issue must be resolved on remand. The record shows that a parole hold was placed on Walker the day of the lineup, September 5, 1986, but there is no showing in the record as

---

[17]For additional examples of "intervening circumstances" that have been deemed sufficient by other courts, see 4 LaFave, sec. 11.4(g), at 434.

to the precise time that the hold went into effect. A parole hold would be relevant to the "intervening circumstances" factor of the *Brown* test.

Again, the burden of proof on the question of admissibility is on the prosecution, and this matter is to be resolved at a hearing prior to the trial.

We next turn to the admissibility of the in-court identification of Walker. If on remand the circuit court determines that the lineup identification evidence is the fruit of the unlawful arrest, the circuit court must then determine whether the in-court identification by any witness who viewed Walker in the lineup must also be excluded as the fruit of the unlawful arrest. *See United States v. Crews,* 445 U.S. 463 (1980). In determining whether an in-court identification is the fruit of an unlawful arrest, the primary question is whether the lineup identification, suppressed as the fruit of an unlawful arrest, has affected the reliability of the in-court identification, making it inadmissible as well. A particular witness's in-court identification is admissible if the court finds it "rest[s] on an independent recollection of [the] initial encounter with [the perpetrator], uninfluenced by the [lineup] identification[ ] . . .." *Id.* at 473. The factors relevant to this inquiry are as follows:

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any prelineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts . . . concerning the conduct of the lineup.

188

*United States v. Wade,* 388 U.S. 218, 241 (1967) (footnote omitted).[18]

As has been stated, if on remand the circuit court finds that the lineup identification evidence is the fruit of the unlawful arrest, the circuit court must then determine whether, in light of the factors mentioned in *Wade,* any in-court identification must also be suppressed as the fruit of the unlawful arrest. The issue of whether any in-court identification of the accused must be suppressed should be resolved at a *Goodchild*[19] hearing, and the burden is on the State to establish by clear and convincing evidence that the particular in-court identification is untainted. *See Brown,* 50 Wis. 2d at 572, 573.

## III.

The third issue this court addresses is whether the circuit court erred when it prevented the jury from hearing evidence about a crime that occurred while Walker was incarcerated, a crime that Walker alleges was similar

[18]In *Wade,* the issue before the Court was "whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel." *Wade,* 388 U.S. at 219-20. Although the issue in *Wade* is slightly different than the issue presented in this case, the above *Wade* factors were found instructive by the Court in *Crews* in resolving the exact issue presented here; namely, whether the pretrial identifications, which could be suppressible as the fruit of an unlawful arrest, have affected the reliability of any in-court identification. *Crews,* 445 U.S. at 473 n.18.

[19]*State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965), *cert. denied,* 384 U.S. 1017 (1966).

to those for which he was on trial. Walker's offer of proof revealed that at approximately 11:00 p.m. on September 26, 1986, a light-skinned black male with liver spots entered the Koretz Tavern in the city of Kenosha and told the bartender that he wanted the money from the cash register.[20] The man spoke quietly and held his right hand inside his jacket, creating the appearance that he had a gun. After receiving the money, he departed on foot. Although the circuit court excluded evidence with respect to this crime, the jury was allowed to hear evidence with respect to two other allegedly similar armed robberies that occurred while Walker was incarcerated.

Walker attempted to have the evidence about the Koretz Tavern robbery admitted on the theory that such evidence was relevant to the issue of his guilt; evidence of crimes similar to those for which he was standing trial that occurred while he was incarcerated could create doubt on the issue of guilt. The circuit court excluded the evidence about the Koretz robbery as irrelevant.[21] The circuit court found that the description of the perpetrator of the Koretz Tavern robbery as a light-skinned black male with liver spots did not match any description of the perpetrator in the cases for which Walker was on trial; therefore, the perpetrator of the Koretz robbery could not have been the perpetrator of any of the crimes for which Walker was on trial. In this court, Walker argues that the circuit court's exclusion of the Koretz

---

[20]The man was also described as having a well-trimmed beard and mustache.

[21]The definition of "relevant evidence," which is set forth in sec. 904.01, Stats., is as follows:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

robbery evidence violated his constitutional right to present a defense, relying primarily upon the court of appeals decision in *State v. Johnson,* 118 Wis. 2d 472, 348 N.W.2d 196 (Ct. App. 1984).

The principles that govern a review of the circuit court's determination on the issue of relevancy are clear. An appellate court must uphold a trial court's determination on an issue of relevancy unless the determination constitutes an abuse of discretion. *State v. Pharr,* 115 Wis. 2d 334, 345, 340 N.W.2d 498 (1983). In *Hartung v. Hartung,* 102 Wis. 2d 58, 306 N.W.2d 16 (1981), this court stated the method for reviewing a trial court's discretionary determination:

> A discretionary determination, to be sustained, must demonstrably be made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law. Additionally, and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination. It is recognized that a trial court in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach, but it must be a decision which a reasonable judge or court could arrive at by the consideration of the relevant law, the facts, and a process of logical reasoning.

*Id.* at 66.

As previously stated, the circuit court excluded evidence about the Koretz Tavern robbery, deeming it irrelevant because of the dissimilarity in appearance between the perpetrator of that crime and the perpetrator of any

of the crimes for which Walker had been charged. The circuit court made the determination based on the facts of the case, the relevant law, and a process of logical reasoning, and the determination is one that a reasonable court could make. Thus, it was not an abuse of discretion for the circuit court to exclude as irrelevant evidence about the Koretz Tavern robbery. Because the evidence is irrelevant, the exclusion of the evidence did not violate Walker's constitutional right to present a defense since "a defendant has no right, constitutional or otherwise, to present irrelevant evidence." *State v. Robinson,* 146 Wis. 2d 315, 332, 431 N.W.2d 165 (1988).[22]

In summary, we conclude that Walker established a prima facie case of purposeful discrimination in the selection of the petit jury and that the prosecution failed to rebut the prima facie case. Walker's conviction, therefore, must be reversed, and he is entitled to a new trial. We further conclude that Walker's warrantless nighttime arrest in his fenced-in backyard violated the fourth amendment to the United States Constitution. On remand, prior to Walker's new trial, the circuit court must conduct a hearing to determine whether, in light of the guidelines set forth in this opinion, the lineup identification evidence must be suppressed as the fruit of Walker's unlawful arrest. If the circuit court finds that the lineup evidence is the fruit of Walker's unlawful arrest, then the court must determine whether, in light

---

[22]*State v. Johnson,* a court of appeals decision upon which Walker relies, does not compel a contrary result. In *Johnson,* the court of appeals noted that, absent a "substantial" or "compelling" state interest, keeping crucial and *relevant* evidence from the jury violated the accused's due process rights. *Johnson,* 118 Wis. 2d at 479. Here, in contrast, the circuit court found the evidence to be irrelevant.

of the guidelines set forth in this opinion, any lineup identification has affected the reliability of any in-court identification, thus rendering it inadmissible as well. We finally conclude that the circuit court's decision to exclude defense evidence about a crime that occurred while Walker was incarcerated did not constitute an abuse of discretion.

*By the Court.*—The judgment and order of the circuit court are reversed.

LOUIS J. CECI, J. (dissenting.) On this appeal, Walker argues that he was denied his state and federal constitutional rights to effective assistance of counsel during his criminal trial. Walker claims that his trial counsel was ineffective when he failed to make an objection, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), during jury selection and when he failed to move to suppress lineup and in-court identifications of Walker as the fruit of an unlawful arrest. The majority, relying on *State v. Cleveland*, 118 Wis. 2d 615, 348 N.W.2d 512 (1984), undertakes a discretionary review of the merits of the alleged *Batson* violation and avoids the issue of ineffective assistance of counsel. The majority then concludes that because Walker is entitled to a new trial pursuant to *Batson*, it need not decide whether he was denied effective assistance when counsel failed to move to suppress the lineup and in-court identifications. I disagree with the approach taken by the majority and would analyze Walker's contentions under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for claims of ineffective assistance of counsel.

A claim of ineffective assistance brought pursuant to the sixth amendment to the United States Constitution must meet the test articulated by the United States Supreme Court in *Strickland. State v. Moffett*, 147 Wis.

2d 343, 352, 433 N.W.2d 572 (1989). Under that test, the defendant must prove not only that his counsel's performance was deficient but also that the deficient performance prejudiced the defense. *Id.* Where, as here, the alleged ineffectiveness relates to counsel's failure to raise a claim on the defendant's behalf, the defendant must prove that he is prejudiced by the omission by showing that the claim was meritorious and that there is a reasonable probability that, but for the omission, the result of the proceeding would have been different. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).

Walker's first claim of ineffective assistance relates to counsel's failure to make a *Batson* objection during jury selection. In deciding *Batson,* the United States Supreme Court contemplated that a minority defendant would object to the prosecutor's allegedly discriminatory use of peremptory challenges before members of the venire are dismissed and before the jury is impaneled. *Batson,* 476 U.S. at 99–100 n.24. *See also* Serr and Maney, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance,* 79 J. Crim. L. & Criminology 1, 18–19 (1988). A *timely Batson* objection ensures that the circuit court is able to contemporaneously review the prosecutor's reasons for striking members of the defendant's race and to easily cure any racial discrimination in the jury selection process *before* trial. *Id.* at 18.

The majority observes, at p. 176 n.12, that *Batson* requires a *timely* objection. However, the majority ignores this requirement and reviews the merits of Walker's *Batson* claim as if it were timely raised.[1] In the

---

[1] In a number of cases cited in the majority opinion, a timely *Batson* objection was made. *See Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988); *United States v. Clemons,* 843 F.2d 741 (3d Cir. 1988); *People v. Scott,* 70 N.Y.2d 420, 516 N.E.2d 1208 (1987);

instant case, Walker did not object to the prosecutor's use of a peremptory challenge as discriminatory until more than eighteen months after the selection of his jury and the commencement of his criminal trial. As a result of the delay, the prosecutor had difficulty remembering the reasons for his use of a peremptory challenge to strike the only black person on the petit jury during jury selection. Where the defendant does not object to the prosecutor's use of a peremptory challenge in a timely fashion, I do not believe that the benefit of enforcing *Batson* by vacating convictions is warranted absent some affirmative showing that the defendant was deprived of a trial before a fair and impartial jury or that the result of the trial was unreliable.

I therefore believe that Walker's claim of ineffective assistance must fail on the prejudice prong of the *Strickland* analysis. At the post-conviction hearing, Walker made absolutely no showing that he had been deprived of a trial before a fair and impartial jury or that the result of his trial was unreliable. Accordingly, I would hold that Walker failed to establish that there is a reasonable probability that, but for counsel's omission, the result of his trial would have been different. If a court is able to dispose of a claim of ineffective assistance on the ground of insufficient prejudice, it need not determine whether counsel's performance was also deficient. *Strickland,* 466 U.S. at 697.

*Pearson v. State,* 514 So. 2d 374 (Fla. Dist. Ct. App. 1987); *United States v. Chalan,* 812 F.2d 1302 (10th Cir. 1987); *United States v. David,* 803 F.2d 1567 (11th Cir. 1986); *State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150 (1986). Where, as here, a *Batson* objection is not raised in a timely fashion, I cannot agree with the majority that a *Cleveland* review of the merits of the *Batson* claim is warranted. I believe that the proper approach is to review such a case under the prejudice analysis of *Strickland.*

Walker's second claim of ineffective assistance relates to his counsel's failure to move to suppress lineup and in-court identifications of Walker as the fruit of an unlawful arrest. I believe that additional fact-finding must be performed on the merits of the motion to suppress before an analysis of Walker's claim of ineffective assistance may be undertaken. I would, therefore, remand the case to the circuit court for additional fact-finding on that issue.

For the reasons stated, I dissent. I am authorized to state that Justice Roland B. Day joins in this dissenting opinion.